IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| WILLIAM HORNE, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. 3:12-CV-1386-BH |
| § | |
| CAROLYN W. COLVIN, ACTING § | |
| COMMISSIONER OF THE SOCIAL § | |
| SECURITY ADMINISTRATION, § | |
| § | |
| Defendant. § | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the consent of the parties and the *Order of Reassignment* dated July 26, 2013, this case has been transferred for all further proceedings and entry of judgment. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed August 9, 2012 (doc. 15), and *Defendant's Motion for Summary Judgment*, filed September 10, 2012 (doc. 16). Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED in part,** Defendant's motion is **DENIED in part,** and the case is **REMANDED** to the Commissioner for further proceedings.

**I. BACKGROUND[1]**

**A.    Procedural History**

William Horne (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner), denying his claims for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. (R. at 1–3.) Plaintiff applied for DIB and SSI on January 22, 2009, alleging disability beginning January 1, 2008,

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

due to high blood pressure, eye problems, umbilical hernia, and diabetes. (R. at 127–36, 157–74.) His claims were denied initially and upon reconsideration. (R. at 67–70.) He requested a hearing before an Administrative Law Judge (ALJ), and on March 30, 2010, he personally appeared and testified at a hearing. (R. at 32–61.) On February 22, 2011, the ALJ issued his decision finding Plaintiff not disabled. (R. at 12–23.) The Appeals Council denied his request for review on April 7, 2012, making the ALJ's decision the final decision of the Commissioner. (R. at 1–3.) He timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (doc. 1.)

**B.     Factual History**

    **1.     Age, Education, and Work Experience**

Plaintiff was born on October 1, 1955, and was 52 years old by the time of the hearing before the ALJ. (R. at 127.) He completed high school and has past relevant work as a restaurant cashier, food server, service station cashier, and certified nurse's aide. (R. at 206.)

    **2.     Medical Evidence**

On January 23, 2008, Plaintiff first sought treatment from Lake Pointe Medical Center (LPMC) for chest pain and other symptoms related to a partially collapsed lung. (R. at 275.) Laboratory tests showed him to be both hypertensive and obese. (R. at 277.) His blood glucose levels were highly elevated, and he disclosed a recent diagnosis of diabetes mellitus II, which was not controlled by medication. (*Id*.) He was released after an overnight stay. (R. at 207.)

On January 10, 2009, Plaintiff was hospitalized at Presbyterian Hospital of Rockwall (Presbyterian). (R. at 214.) He reported having severe abdominal pain for the past three or four months, as well as severe nausea and loss of appetite. (R. at 233.) An abdominal computed tomography (CT) scan revealed a herniation of his intestinal wall. (R. at 234.) Doctors prescribed

him several pain medications. (R. at 242.) He was discharged the next day with instructions to follow up with his primary care physician. (R. at 214–15.) A CT scan of his lumbar spine revealed spondylolysis[2], a degenerative change of the spine. (R. at 307.)

On March 26, 2009, Plaintiff saw David Tasker, M.D., for a consultative examination at the direction of disability determination services. (R. at 289.) Dr. Tasker found that without corrective lenses, Plaintiff had 20/60 vision in his right eye and 20/80 vision in his left eye. (*Id.*) With corrective lenses, however, Plaintiff's vision in both eyes was restored to 20/20. (*Id.*) Dr. Tasker diagnosed "early cortical cataract in both eyes", as well as myopic astigmatism and presbyopia, but ruled out diabetic retinopathy. (R. at 289–90.) He prescribed Plaintiff corrective lenses and noted that his prognosis was "very good." (R. at 290.)

On March 31, 2009, Mary Jo Hernandez, M.D., a state agency medical consultant (SAMC), reviewed Plaintiff's evidence and completed a physical Residual Functional Capacity (RFC) assessment. (R. at 293–300.) Dr. Hernandez determined that Plaintiff had the following RFC: lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for six hours in an eight-hour workday; push and pull an unlimited amount of weight, and no postural, manipulative, visual, communicative, or environmental limitations. (R. at 294–97.) Her comments referenced Plaintiff's visit to the emergency room on January 10, 2009, due to abdominal pain, as well as his history of hernia repair. (R. at 300.)

On June 17, 2009, Plaintiff returned to Presbyterian, complaining of severe abdominal pain. (R. at 303–61.) A CT scan showed that the hernia had developed a loop above the small bowel, causing a minimal obstruction. (R. at 307, 370.) Blaire Biggers, M.D., performed corrective

---

[2] Spondylolysis is a "degenerative condition of a vertebra which does not involve slippage." *Ausman & Snyder's Medical Library* 3 (L.Ed, Lawyer's Cooperative Publishing Co., 1989).

surgery. (R. at 331.) Dr. Biggers noted "degenerative changes of the spine." (R. at 327.) During a follow-up consultation on July 8, 2009, Dr. Biggers found that the surgical wound was "healing nicely" and that Plaintiff was "doing well." (R. at 364.) Dr. Biggers advised him against engaging in vigorous activity and instructed him to return in four to six weeks. (*Id.*) Plaintiff admitted he was not taking his medications for diabetes and hypertension. (R. at 370.) Dr. Biggers prescribed him additional medications and "glucometer strips", and instructed him to check his blood glucose level three times a day. (R. at 371.)

On August 5, 2009, Plaintiff saw Les Sandknop, D.O., an orthopedic surgeon, for an initial assessment regarding his lower back pain. (R. at 356.) A physical examination revealed tenderness in the spine from the first lumbar vertebrae to the first sacral vertebrae. (*Id.*) Dr. Sandkop assessed "lumbar spondylolisthesis."[3] (*Id.*) He also noted Plaintiff had disk damage in the neck caused by age-related degeneration. (*Id.*) Dr. Sandknop prescribed him flexion exercises and medications for his pain. (*Id.*)

### 3. Hearing Testimony

On March 30, 2010, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 30–61.) Plaintiff was represented by an attorney. (R. at 30.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that he was born on October 1, 1955, and had a high school diploma. (R. at 33–34.) He was certified as a nurse's aid, but had worked as a fast food server and cashier in recent years. (*Id.*) He last worked as a food worker and was terminated because he could no longer

---

[3] Spondylolisthesis is a "congenital defect where the neural arch of the vertebra causes one vertebra to slip forward upon another, most commonly in the lower lumbar vertebra. This is often confused with spondylolysis." (*Id.* at 69.)

perform the essential functions, such as carrying a case of soft drinks or disposing of garbage. (R. at 38.) He experienced severe stomach pain due to his hernia at that time. (*Id*.) After that, he applied for a job as a restaurant cashier, but the position required more physical exertion than just "running a cash register," so he was not hired. (R. at 40.)

Plaintiff could not work because of his hernia and because his "back [was] bad." (R. at 36.) He could not lift more than 15 pounds, stand more than one hour, or walk for more than one block at a time. (R. at 52.) He experienced abdominal pain on a daily basis and the pain sometimes caused him to sweat, bend over, and black out. (R. at 53.) He had severe episodes of pain two to three times a month that lasted anywhere from 30 minutes to several hours. (*Id*.) He tried to "take it easy" and "recline back" to lessen his discomfort. (R. at 54.)

Plaintiff could wash dishes, do laundry, and clean the bathroom, bedrooms, and living room. (R. at 45.) He also prepared his own meals and played chess with his friends. (R. at 45–46.) Because he did not have a driver's license, he spent most of the day sitting in his recliner, either reading or watching television. (R. at 47.) He received food stamps and went to the emergency room for his healthcare needs. (R. at 43.)

Counsel asked the ALJ to take notice of Plaintiff's lumbar spondylolisthesis diagnosis and requested a consultative physical examination. (R. at 43, 55.)

### *b.  Vocational Expert Testimony*

The VE testified that Plaintiff's past relevant work included jobs as a food worker (light, unskilled, SVP-2), restaurant cashier and service station worker (light, semi-skilled, SVP-3), and certified nurse's aide (medium, semi-skilled, SVP-4). (R. at 57.)

The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education,

and work experience could perform his past relevant work with the following limitations: perform at least light work; stand, walk, and sit for six hours in an eight-hour workday; and no pushing or pulling limitations. (R. at 57–58.) The VE opined that the hypothetical person could perform Plaintiff's past relevant work as a restaurant cashier, and food worker. (R. at 58.) When the ALJ added the limitation of sitting and standing for two hours in an eight-hour workday, the VE opined that this would preclude all of Plaintiff's past relevant work. (*Id.*) The VE also testified that this limitation would preclude all competitive employment. (R. at 59.)

In response to counsel's question, the VE opined that if the hypothetical person missed between 30 minutes to three hours of work two or three times a month due to his physical condition, he could not maintain competitive employment. (R. at 59–60.) Counsel then modified the hypothetical to include the limitations of sitting for 15 to 20 minutes, standing for 45 minutes at a time, walking for less than a block, and lifting 10 to 15 pounds. (R. at 60.) The VE opined that the person could not maintain competitive employment. (*Id.*)

C.   **ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion on February 22, 2011. (R. at 15–23.) At step one, the ALJ determined that Plaintiff met the insured status requirements of Title II through September 30, 2012, and had not engaged in work activity since his alleged onset date of January 1, 2008. (R. at 17.) At step two, the ALJ found that Plaintiff had four severe impairments: umbilical hernia, diabetes, hypertension, and obesity. (*Id.*) At step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met any impairment listed in the regulations. (R. at 18.)

Before proceeding to step four, the ALJ determined that Plaintiff retained the following RFC:

lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for six hours in an eight hour workday; no pushing or pulling limitations, and no postural, manipulative, visual, communicative, or environmental limitations. (R. at 18.) At step four, with the VE's testimony, the ALJ determined that Plaintiff could perform his past relevant work as a food worker, restaurant cashier, and service station cashier (R. at 23.) Accordingly, the ALJ determined that Plaintiff was not disabled, as the term is defined under the Social Security Act, at any time between his alleged onset date of January 1, 2008, and the date of the ALJ's decision. (*Id.*) The ALJ's decision stated that Plaintiff did not seek treatment from June 2009 to the date of his decision. (R. at 22.)

**D.** **New Evidence Submitted to the Appeals Council**

After the ALJ rendered his decision, Plaintiff submitted a request for review to the Appeals Council. By letters dated February 22, 2012, he submitted additional medical records from his treating physicians dated from January 2008 through May 2011. (R. at 372, 376, 373-428.)

On November 4, 2009, Plaintiff saw Dr. Sandknop because he was experiencing insomnia, chronic back pain, and frequent urination. (R. at 416.) An examination revealed tenderness between the fourth lumbar vertebrae and first sacral vertebrae consistent with spondylotic spondylolisthesis. (*Id*.) His blood glucose was found to be well above normal, confirming the diabetes mellitus II diagnosis from 2008. (*Id*.)

On July13, 2010, Plaintiff returned to Dr. Sandknop's office complaining of tingling, numbness, and limited limb mobility. (R. at 419.) Dr. Sandknop prescribed him pain medication, as well as medications for his diabetes. (*Id*.) Visits to Dr. Sandkop continued throughout 2010 for treatment of Plaintiff's lower back pain, as well as for more benign complaints, such as acid reflux. (R. at 424–27.)

On April 6, 2011, Dr. Sandknop completed a medical questionnaire. (R. at 373–75.) He explained that Plaintiff had physical limitations caused by his back and leg pain, diabetes, and osteoarthritis. (R. at 373–74.) He opined that Plaintiff could sit, stand, and walk for four hours in an eight-hour workday, but could sit for only one hour at a time. (R. at 373.) He further opined that Plaintiff could "never" lift or carry more than 10 pounds; could not use his feet to operate foot controls due to his "poor" balance and gait; could not bend, squat, climb, reach up, or kneel due to his osteoarthritis and poor gait; and needed to change positions "frequently." (R. at 373–74.) Plaintiff also needed frequent rest periods during the day and was likely to miss work more than four days a month. (R. at 375.) Objective signs of Plaintiff's pain were redness, joint deformity, X-rays, muscle spasms, arthritic changes, disc abnormalities, and magnetic resonance images. (R. at 374.) According to Dr. Sanknop, Plaintiff's pain was chronic and "severe." (*Id.*) He indicated that Plaintiff's symptoms became disabling three years earlier and were expected to last indefinitely. (R. at 375.) Alcohol or drug use was not a contributing factor to Plaintiff's condition. (*Id.*)

On May 21, 2011, Plaintiff was again admitted to Presbyterian due to chest and abdominal pain and frequent vomiting. (R. at 397.) Upon discharge two days later, he was ambulating well and with minimal discomfort. (R. at 403.) Treatment notes revealed Plaintiff's smoking habits and past recreational drug use. (R. at 401.)

Plaintiff presented to LPMC the following week complaining of acute abdominal, chest, and back pain. (R. at 387.) Significant disk degeneration and spondylotic spondylolisthesis were again detected by an MRI. (R. at 388.) The treating physician recommended physical therapy for the spondylolisthesis and disk degeneration, as well as eventual surgical stabilization. (*Id.*)

## II. ANALYSIS

### A. Legal Standards

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id*.

## 2. Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work,
other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The

analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.     Issues for Review**

Plaintiff presents two issues for review:

(1)     New and material evidence submitted to and considered by the Appeals Council is part of the record and must be considered by the reviewing court when determining whether [the] Commissioner's decision is substantially supported. Did the Appeals Council properly consider multiple new and material exhibits from [Plaintiff's] treating doctors when they issued a boilerplate denial of [Plaintiff's] request for review? Did the new and material evidence submitted to the Appeals Council dilute the record such that the ALJ's decision is not substantially supported?

(2)     Failure to use the correct severity standard or creating ambiguity as to the standard used at step two of the five-step disability evaluation process results in either legal error or in reversible error if prejudice is shown. The ALJ failed to establish that the correct severity standard was applied to all of [Plaintiff's] medically determinable impairments. Did the ALJ create legal or reversible error requiring remand?[4]

(Pl. Br. at 1.)

---

[4] Although Plaintiff lists this issue second, it is addressed first because the definition of "severity" used by the ALJ at step two directly impacts the disability analysis in the remaining steps. *See Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000).

### C.   Severity Standard

Plaintiff contends that the ALJ erred because he applied an incorrect severity standard at step two. (Pl. Br. at 12.) He argues, in essence, that the error was not harmless and requires remand because the ALJ failed to recognize his reduced vision and extensive back impairments as severe. (*Id.* at 13–14.)

####   1.   *Stone*

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Finding that a literal application of these regulations would be inconsistent with the Social Security Act, the Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104–05 (5th Cir.1985). Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." (*Id.* at 1104.)

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to [*Stone*] or another [opinion] of the same effect, or by an express statement that the construction" the Court gave to 20 C.F.R. § 404.1520(c) (1984) was used. *Id*. at 1106; *accord Loza*, 219 F.3d at 393. Notwithstanding this presumption, the Court must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d

1308, 1311 (5th Cir.1986).

Here, in reciting the applicable law, the ALJ first stated that "[a]n impairment or combination of impairments is 'not severe' only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." (R. at 16.) The ALJ then cited to *Stone*. (*See id.*) He went on to state that "[a]n impairment or combination of impairments is 'severe' within the meaning of the regulations if it *significantly* limits [the claimant's] ability to perform basic work activities." (*Id.*) (emphasis added).

As discussed, *Stone* provides no allowance for a *minimal*, and much less a *significant*, interference with a claimant's ability to work. The difference between the ALJ's second statement and *Stone*, coupled with the ALJ's failure to specify which severity standard he actually applied, compel the conclusion that he applied an incorrect standard of severity. *See Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3 (N.D. Tex. Jan. 26, 2010) (explaining that courts in this district have consistently rejected, as inconsistent with *Stone*, the definition of severity that the ALJ cited); *see also Lawson v. Astrue*, No. 4:11-CV-00426, 2013 WL 449298, at *4 (E.D. Tex. Feb. 6, 2013) ("while the difference between the two statements appears slight, it is clear that the [regulatory definition] is not an express statement of the *Stone* standard").

    **2.**    **Harmless Error**

As recently held by the Fifth Circuit and courts within this district, *Stone* error does not mandate automatic reversal and remand, and application of harmless error analysis is appropriate in cases where the ALJ proceeds past step two in the sequential evaluation process. *See Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (per curiam) (applying harmless error analysis where the

ALJ failed to cite *Stone* at step two but proceeded to steps four and five of the sequential evaluation process); *Goodman v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-1321-G BH, 2012 WL 4473136, at *9 (N.D. Tex. Sept. 10, 2012), *rec. adopted*, 2012 WL 4479253 (N.D. Tex. Sept. 28, 2012); *Jones v. Astrue*, 821 F. Supp. 2d 842, 851 (N.D. Tex. 2011). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Here, at step two, the ALJ found that Plaintiff had four severe impairments: umbilical hernia, diabetes, hypertension, and obesity. (R. at 17.) Because none of Plaintiff's impairments or combination of impairments met or medically equaled a listed impairment at step three, the ALJ assessed Plaintiff's RFC. (R. at 18.); *see also* 20 C.F.R. § 404.1520a(d)(3); *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001) ("If the [claimant's] impairment is severe, but does not reach the level of a listed disorder, then the ALJ must conduct a [RFC] assessment.") The ALJ determined that Plaintiff had the following RFC: lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for six hours in an eight hour workday; no pushing or pulling limitations, and no postural, manipulative, visual, communicative, or environmental limitations. (R. at 18.)

In assessing Plaintiff's RFC, the ALJ explained that he "considered, evaluated, analyzed, and weighed all [of Plaintiff's] complaints" and found that his "allegations of disabling physical limitations in his ability to perform basic work-related activities [were] neither credible, nor consistent with, nor supported" by the medical evidence of record. (R. at 20.) Consideration of all "medically determinable impairments ... including [those] that are not 'severe'", and "all of the relevant medical and other evidence," is required by the regulations when determining a claimant's

RFC. *See* 20 C.F.R. § 404.1545(a)(2)-(3) (2012); SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. 1996) ("While a 'not severe' impairment standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.").

In discussing his disability determination, the ALJ acknowledged Plaintiff's complaints of "reduced vision." (R. at 17.) He referenced Dr. Tasker's findings on March 16, 2009, that Plaintiff "had early cortical cataracts in both of his eyes." (R. at 17, 289.) He noted that Plaintiff's vision was 20/20 in both eyes with lens correction. (*Id.*) The ALJ also referenced Plaintiff's visit to LPMC on January 22, 2008, where he was diagnosed with "only mild lung collapse." (R. at 18–19, 275.) He noted Plaintiff "was released after just one night," and concluded that this condition "did not have a serious impact on [Plaintiff'] functional ability" since he received no further treatment for it. (R. at 19.) The ALJ also pointed to Plaintiff's admission to Presbyterian for abdominal pain due to an umbilical hernia. (R. at 19, 214.) He determined that Plaintiff's failure to follow up with his primary care physician regarding his pain suggested "that the pain ... was not as debilitating as he alleged." (R. at 19.) The ALJ acknowledged Plaintiff's surgery to correct his hernia on June 17, 2009, and pointed to his surgeon's finding during a subsequent evaluation that Plaintiff "was doing well" and that he should follow up "as needed." (R. at 19, 364.) The ALJ considered it important that Plaintiff did not seek any further treatment regarding his hernia or abdominal pain. (R. at 19.)

The ALJ also found important Plaintiff's admitted non-compliance, explaining that his failure to take the medications prescribed for his hypertension and diabetes indicated that "the symptoms may not have been as limiting as [Plaintiff] alleged." (R. at 19, 370.) He also found no indication in the record that Plaintiff checked his blood sugar three times a day, as Dr. Biggers

instructed him to do on June 19, 2009. (R. at 19, 371.)

The ALJ noted inconsistencies with Plaintiff's testimony. (R. at 20.) While Plaintiff testified that he could sit for only 15 or 20 minutes, he also stated that he sat in his recliner and watched television most of the day. (R. at 20, 47.) At the hearing, the ALJ observed Plaintiff's "demeanor and behavior", as well as his body dynamics and entrance and exit from the room. (R. at 20.) He also remarked about the absence of treatment records from June 2009 to the date of his decision. (R. at 22.)

Lastly, the ALJ referenced and gave "due weight" to the consultative opinions of Dr. Hernandez, a SAMC. (R. at 20, 22.) Emphasizing Dr. Hernandez's "expertise" in disability evaluation, the ALJ adopted her RFC findings that Plaintiff could perform "light work", could sit, stand, and walk for six hours in an eight-hour workday, and had no other limitations. (R. at 20, 294–97.) He then proceeded to step four, and with the VE's testimony, he determined that Plaintiff could perform his past relevant work as food worker, restaurant cashier, and service station cashier, and he was therefore not disabled. (R. at 23.)

The ALJ's narrative discussion shows that he considered Plaintiff's reduced vision due to his cataracts. On March 26, 2009, Dr. Tasker found that Plaintiff's vision was corrected to 20/20 with prescription lenses, and his prognosis was "very good." (R. at 289–90.) At step two, it was still Plaintiff's burden to prove he had an impairment or combination of impairments that rendered him "incapable of engaging in any substantial gainful activity." *See Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986); *see also Fraga v. Bowen*, 810 F.2d 1296, 1301 (5th Cir. 1987). "If an impairment reasonably can be remedied by treatment, it cannot serve as a basis for a finding of disability." *Stillwell v. Cohen*, 411 F.2d 574, 575–76 (5th Cir. 1969) (citation omitted).

Accordingly, the ALJ's *Stone* error with respect to this condition was harmless.

The ALJ did not discuss or mention Plaintiff's back impairments, however. A CT scan conducted at Presbyterian on January 10, 2009, revealed spondylolysis, a degenerative change of the spine. (R. at 307.) During Plaintiff's June 17, 2009 hospitalization for hernia repair, Dr. Biggers diagnosed "degenerative changes of the spine." (R. at 327.) On August 5, 2009, Dr. Sandknop, an orthopedic surgeon, diagnosed lumbar spondylolisthesis and prescribed Plaintiff flexion exercises and pain medication. (R. at 356.) Plaintiff testified that he was disabled because of his hernia and his back. (R. at 36.) The ALJ did not discuss or even address this evidence. (*See* R. at 15–23.)

Because the ALJ did not address Plaintiff's back impairments at any step of the disability analysis, it is unclear whether he purposefully dismissed them as non-severe based on his application of an incorrect severity standard at step two. The ALJ did not consider the possible effects that these impairments may have on Plaintiff's ability to perform physical work-related functions when assessing his RFC, as he was required to do by the regulations and the corresponding ruling. *See* 20 C.F.R. § 404.1545(a)(1)–(3); SSR 96-8p, 1996 WL 374184, at *5. Consequently, he did not consider how these impairments may have affected Plaintiff's ability to engage in substantial gainful activity. It is not inconceivable that the ALJ would have imposed greater exertional limitations on Plaintiff's RFC, such as restricting the amount of weight he could lift, or the length of time he could sit, stand, or walk, if he had considered the effects of Plaintiff's spondylolysis and spondylolisthesis on his ability to work. It is not inconceivable therefore, that the ALJ would have posed a more restricted hypothetical to the VE and a different disability determination would have been reached. Accordingly, the ALJ's failure to ensure the *Stone* severity standard was used at step two was not harmless as to this impairment and requires remand. *See Hall v. Astrue*, No. 3:11-CV-1929-BH,

2012 WL 4167637, at *13 (N.D. Tex. Sept. 20, 2012) (holding that *Stone* error was not harmless and required remand because the ALJ did not address or consider the effects of the claimant's chronic nasal congestion on his ability to work at any step of the sequential evaluation process).[5]

### III.   CONCLUSION

Plaintiff's motion is **GRANTED in part**, Defendant's motion is **DENIED in part**, and the case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED**, on this 9th day of September, 2013.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[5] Because the ALJ will necessarily review the evidence that was submitted for the first time to the Appeals Council on remand, Plaintiff's first issue need not be addressed.